MAYERS, OSTERWALD & MUHLFELD (INC.) *v.* E. F. BENDLER and UNITED STATES (No. 3267)[1]

---

[1] T. D. 44093.

United States Court of Customs and Patent Appeals, June 4, 1930

*Blackman, Pratt & King (Addison S. Pratt of counsel) for appellant.*
*Marion De Vries and Jesse P. Crawford for appellee.*

[Oral argument April 15, 1930, by Mr. Addison S. Pratt and Mr. De Vries]

Before GRAHAM, Presiding Judge, and BLAND, GARRETT, and LENROOT, Associate Judges [1]

GRAHAM, Presiding Judge, delivered the opinion of the court:

This is an appeal by an American wholesaler and dealer in diamonds, pearls, and other precious stones, from a judgment of the United States Customs Court, Third Division, overruling the protest filed by appellant under the provisions of section 516 (b), of the Tariff Act of 1922. The merchandise involved consisted of a diamond, cut and unset, weighing 78⅝ carats and called the Nassak or Nassac diamond, which had been classified and admitted to free entry under paragraph 1708 of the Tariff Act of 1922 as an artistic antiquity. After the diamond had been delivered to the importer, and within 60 days after liquidation, the American wholesaler filed protest claiming it to be dutiable under paragraph 1429 of said act, which reads in part as follows:

PAR. 1429. * * * diamonds, coral, rubies, cameos, and other precious stones and semiprecious stones, cut but not set, and suitable for use in the manufacture of jewelry, 20 per centum ad valorem; * * *.

Paragraph 1708 follows:

PAR. 1708. Works of art (except rugs and carpets), collections in illustration of the progress of the arts, works in bronze, marble, terra cotta, parian, pottery, or porcelain, artistic antiquities, and objects of art of ornamental character or educational value which shall have been produced more than one hundred years prior to the date of importation, but the free importation of such objects shall be subject to such regulations as to proof of antiquity as the Secretary of the Treasury may prescribe.

The lower court overruled the protest of the American wholesaler and held the diamond to be free of duty under paragraph 1708 as an artistic antiquity produced more than 100 years prior to the date of importation.

In the court below, importer, appellee herein, moved to dismiss the protest upon the following grounds:

1. That the court has no jurisdiction of the subject matter or remedy sought.
2. That there is no provision of law authorizing such protest in this case.

[1] HATFIELD, Judge, took no part in this case.

3. That the provisions of section 516, which alone authorize and provide for protests by American manufacturers or producers do not warrant protests in such cases there not having been a previous importation upon which notices and other statutory conditions precedent provided in said section of the law are or could be predicated.

4. That the conditions precedent in the proceedings provided by section 516 authorizing protests by American manufacturers or producers have not been complied with; that the acts, decisions, conditions, and notices therein provided which shall have been previously had by the Secretary of the Treasury and other officials of the Government have not in this case been had; that the provisions of said section 516 do not apply to an instant importation such as this but solely and only after proceedings had thereunder with reference to an instant importation whereupon said protest and such protests may be lodged against subsequent importations.

5. That there is no law authorizing the protest herein or supporting the same.

This motion was denied by the Third Division of the United States Customs Court, and in a very carefully prepared and well-written opinion Mr. Justice Waite, speaking for the court, held that such preliminary acts and conditions required by the section had been complied with and that the American wholesaler, appellant, was within his statutory rights in filing the protest after such preliminary requirements had been complied with and in directing same against the initial importation. This action on the part of the court below has been assigned as error here and has been ably argued at great length by appellee's counsel.

Appellees point out that section 516 (b) accords to domestic manufacturers, producers, and wholesalers a new statutory right, and contends that previously Congress had always denied the granting of this kind of privilege, since it would afford competitive domestic interests a legal way of interfering with and hampering international commerce to the great financial loss of those engaged in it, and that as the law was finally adopted it was intended to provide only for a protest by such producer in entries other than the one concerning which the original notice and complaint were filed with the Secretary of the Treasury and not against liquidations in "initial importations"; that the law was framed upon the theory that American producers finding certain goods coming into the country free of duty, or upon which duty was assessed, at an erroneous rate, to their damage, would have the right to attempt to induce the Secretary of the Treasury to require a change in classification, and that upon failure to obtain such relief through the department, then only would protest lie against subsequent entries.

The chief reason given by appellees for their belief that this was the intent of Congress is to the effect that one importation would not be regarded as sufficiently harmful to the American producer to justify congressional solicitude in his behalf, and that if there were subsequent importations opportunity for protest would be afforded, and that

Congress could not be presumed to have intended to give domestic interests the right to damage and possibly destroy the business of American importers by authorizing an action which might result in the reclassification of merchandise which had already been admitted free and gone into commerce. Appellees point to the case at bar as an example where an importer with the consent and full approval of the customs officials had imported, free of duty, a very valuable diamond which, if dutiable, would be taxed with one-fifth of its great value; that in a case of this kind the importer might well have sold or parted with the diamond at a price based upon its free entry, and argues that if the statute is construed as the lower court has construed it, no importer may know for 60 days after liquidation the dutiable status of any given entry, and that possibly, after long and expensive litigation instituted by a party unknown on the date of importation, a different rate may be determined upon.

This logic and the strength of appellees' position can not be brushed aside as frivolous or wholly fallacious. It would seem to us that Congress in some appropriate way would desire to protect American importers against just such a contingency as is here pointed out, but, as we view the statute, it did not do so. We can not insert into the section a provision which Congress withheld, nor do we find such ambiguous language contained therein as will permit of the construction contended for. It will be noticed that after the "complaint" has been filed and relief refused, the American producer may file with the Secretary a notice that he desires to protest and that the producer "may file within 60 days after the date of liquidation with the collector of such port a protest in writing," etc. There is no language in the section which may be interpreted as meaning that the protest can not be filed against an initial liquidation after the statutory prerequisites have been complied with. It is not contended here that the prerequisites have not been complied with.

Appellant argues that in all probability, in cases like that at bar, there would be no second or subsequent opportunity for protest and that millions of dollars worth of merchandise of different importers might be admitted free of duty, which merchandise was in fact dutiable, and that such result might greatly damage the American producer, contrary to the intent of Congress.

The court below properly overruled the motion to dismiss. The language used by Congress will not permit of the construction contended for by appellees.

Before proceeding to the merits of the case, and in view of the contention that the diamond in controversy is an artistic antiquity, we regard it as highly important to fully set out the description, history, and pertinent facts concerning the same as they appear from a very full and complete record in the case and in this respect there is little,

if any, dispute between the parties. It is stated and not denied that the Nassak diamond is one of the first 24 great diamonds of the world. Its history and characteristics are treated at length in many of the authoritative treatises on diamonds, precious stones, and related subjects. Extracts from a large number of such treatises were introduced into the record without objection.

From these several works and from the testimony in the case the facts which follow are adduced. The Nassak diamond derives its name from the fact that it long remained in the temple of Shiva, near Nassak, on the upper Godavery River in India, where it adorned the statue of Shiva in a temple where the idol was worshipped by the priests. It was acquired by the English as part of the booty of the Mahratta war. During the war it disappeared from the idol and was later produced by the last independent Indian Prince of Peishwa, and handed over to Col. J. Briggs, who later delivered it to the Marquis of Hastings, under whom the military operations against the Peishwa had been conducted. From Hastings it went to the East India Co. and at that time was valued at about 30,000 pounds. It was brought to the London market in the year 1818 and soon afterwards was sold by the East India Co. to Messrs. Rundell & Bridge. It was then said to be "a diamond of great purity but of bad form of about 89 carats." It was described at that time as somewhat pear-shaped, having been cut in India at a date unknown, although its history is said to be traced back to the fifteenth century. In its original cutting (as characterizes most Indian cuttings) everything had been sacrificed to size and it was described as being a "rudely-faceted, lustreless mass." The cutting while in the hands of Rundell & Bridge was done under the instruction to the cutter "to keep as closely as possible to the traces of the Hindu cutter, 'amending his defects, and accommodating the pattern to the exigencies of the subject matter.'" It was recut at a sacrifice of no more than 10 per centum of its original weight. In the year 1831, the diamonds in the possession of Rundell & Bridge were disposed of at public auction, the Nassak diamond being sold for 7,200 pounds to Emanuel Bros. and in 1837 sold by Emanuel Bros. at public sale to the Marquis of Westminster, in whose family it remained for many years, and was at one time in the hilt of the sword of the Duke of Westminster. In S. M. Burnham's publication "Precious Stones" (1886), it is stated that after being recut it gained vastly in brilliancy and in value to a price between 30,000 and 40,000 pounds.

A full description of the size and shape of the diamond, together with cuts of the same, made from different angles, is shown in several of the various publications referred to, and the diamond itself was also produced in the court below and in this court as the original exhibit. Its form may be said to be that of a somewhat elongated triangle with rounded corners. In depth as distinguished from breadth,

one side of the triangle is thicker than the other. It is stated to be without flaw, unusually brilliant, and so cut as to well display its clear, crystal brilliancy.

Pertinent portions of the testimony of appellant's witnesses may be summarized as follows, the testimony of no witness being introduced on the part of appellees:

John F. Kean, for 24 years an examiner of merchandise at the port of New York, and who for 10 years previous to the trial below had been examiner of jewelry, precious stones, pearls, and imitation precious stones, testified that during that time he had returned importations of diamonds, loose, cut, and unset, for duty at 20 per centum and that he followed the regulations of the department promulgated in 1911, T. D. 31263.

William F. Beller, chief clerk in the liquidation division of the collector's office, testified that he had been chief liquidator from 1892 to the time of giving the testimony, and that he had general supervision of the work of liquidation in the liquidating bureau where all entries passed through, and secured information on the work and saw that decisions were put in force; that the practice had been to liquidate unset, cut precious stones, during the time he acted as liquidator, in accordance with the appraiser's report and according to the prevailing tariff act; that the rate had been on unset, cut diamonds, 10 or 20 per centum, and that such diamonds had not been classified as artistic antiquities; that the Nassak diamond was passed free.

Marcus S. Van Wezel, a former member of the firm of S. L. Van Wezel & Co., a retired diamond cutter of over 50 years' experience, stated that he was a practical diamond cutter, having acted in such capacity himself and supervised others, employing quite a number of men; that diamonds are cut and polished on an iron wheel; that the first thing done in the cutting of a diamond is to examine it to find out what is the best way to cut it; that "you cleave the stone, or you saw the stone or you manufacture the stone" always following the grain of the diamond; that the diamond has a grain the same as a piece of wood and you cleave or saw it "along those lines of the grain"; that it then goes to the diamond cutter who shapes the stone, makes the shape of the stone by putting the diamond on a cement stick, i. e., the diamond is put in a piece of cement which is heated; another rough diamond then is rubbed against it until the required shape of the diamond is brought about; that after this process it goes to the polisher where the facets are made; that here is where the iron wheel is used; that the wheel is turned at about 250 revolutions per minute by machinery; that diamond dust or bort is made into a salve and is used by placing it on the wheel; that diamond alone can cut a diamond; that each facet is cut on a certain angle according to certain mechanical or mathematical rules; that also there are definite

rules as to the making of the table which is the top part of the diamond and the collet which is the small point at the bottom which reflects the light and gives brilliancy to the diamond; that the girdle is the broadest diameter of the diamond; that the reason diamonds are made with facets is to promote brilliancy by refraction or reflection and that it is the refraction of the light from one facet against the other and the light playing through the lower part that gives it its brilliancy; that there is no brilliancy whatever to an unpolished stone and that you must have facets to have brilliancy; that the workmen who do the above work are known as mechanics—at times they were called skilled laborers—but that in his recollection they were never called artists; that the witness never went to college or studied art in any form, and his education was that of a diamond polisher.

Jacob Mehrlust stated that he was a designer and manufacturer of diamond jewelry; that he had been a designer for 32 years and a manufacturer and designer for 22 years; that he graduated from school, went to the city college, and studied art in Pratt's Institute; that he studied historical ornamentation and architectural drafts-manship—decorative art in a general way—general art; that he led his class always in drawing; that he had designed jewelry, including large stones; that he had designed jewelry which was used for setting much larger stones than this particular one and that the Nassak diamond was suitable for the manufacture of jewelry. He further testified that in his opinion the Nassak diamond would not be called artistic; that, according to his definition of art, he would consider it "the expression of an idea in the most æsthetic form," and that the diamond before him was not an expression of an idea in æsthetic form; that "it is just simply shaped and polished stone; there is no idea in it excepting that it is made brilliant by mechanical means. Of course, I just looked at it. Now, the top seems to be more or less modern cut; at the back of it it is polished in Indian fashion without any just relation to the symmetry, you know, as to the facets. * * * On top, this top is more like a heart-shape or pear-shape diamond would be cut. I notice those facets are regular, they are regular on the back, too, I notice now. * * * I don't think it expresses any idea; therefore, I don't think it is any more artistic than any other diamond or stone would be that is cut for the purpose of enhanc-ing the brilliancy and shape of the stone. * * * If this diamond were engraved with some beautiful character, something that would express an idea itself, I would call it artistic; but I would not call this artistic more than a marquise diamond." He stated that he did not regard a perfect sphere as artistic nor anything triangular as artistic; that none of these shapes would be regarded as artistic if considered by themselves; that he would regard none of the 23 more famous diamonds as artistic.

124

William E. Marcus, jr., a retail jeweler since 1906, an officer of the corporation of Marcus & Co., a student at Yale who apparently did not know what articles of vertu were, but who had studied decorative art as applied to jewelry, stated that the Nassak diamond was not artistic and that no other diamond similarly cut would be regarded by him as artistic; that it might be cut in some other form so as to make it artistic, but that it would have to be decorated; that the Washington Monument was artistic; that his notion of a work of art was the same as the preceding witness's; that a diamond itself may be cut in such a manner as to represent a figure, thereby making an artistic thing of it, representative of the idea of the creator of it.

Robert Vonnoh, an artist, portrait and landscape painter, a painter of figures, etc., for about 54 years, who studied in the Massachusetts State Art School at Boston, at the Academie Julien in Paris, and practiced his profession since 1883, having gone abroad a number of times and had paintings in the various galleries of Europe and who had works in the Metropolitan Museum, the Brooklyn Museum, and in Philadelphia, and Los Angeles, and was a member of the National Academy, testified among other things that in his opinion the diamond was not artistic, inasmuch as it was a mechanical production; that a building or a room if perfect in proportion and if the material was used in æsthetic production would be a work of art.

The only question presented for our determination is whether the imported diamond is properly dutiable as a "diamond, cut but not set, and suitable for use in the manufacture of jewelry," or free as an "artistic antiquity, * * * produced more than one hundred years prior to the date of importation." That it is a diamond, cut but not set, and suitable for use in the manufacture of jewelry, is conceded. If it be also an artistic antiquity, produced more than 100 years prior to the date of its importation, the question would then arise as to the comparative specificity of the two provisions of the law.

That the diamond before us is an antiquity, no one will deny. But one question therefore remains: Is it artistic, within the meaning of the statute? This at once suggests the inquiry: What more has been done to this diamond than has been done to any diamond, cut but not set, and suitable for jewelry uses? The stone was cut and faceted by artisans, diamond cutters, first in remote times in some Indian workshop, and then by European workmen. In cutting it, nothing was done but that which is always done in cutting a diamond, namely, to so cut it as to refract and reflect the rays of light properly and thus add to its beauty and brilliancy. No special design was used except such as has been known to the art since time immemorial. It was the conventional cutting required by the shape of the stone. The Con-

gress indicated by a statutory provision, paragraph 1429, that cut diamonds should be dutiable. If this diamond, cut in the ordinary way, is to be treated as artistic, where shall we say the line of demarcation is between dutiable cut diamonds and free artistically cut diamonds, having in mind, of course, diamonds which have been produced more than 100 years prior to importation? Certainly not in the size of the stone, for the law has made no such distinction. Certainly not in the beauty of the stone, for the law has made no such distinction. But one test is proposed by the law, namely, that it shall be artistic.

It is very evident, from a consideration of said paragraph 1708, that by the term "artistic antiquities" the Congress had in mind something more than the mere ordinary work of an artisan. Associated as the term is with works of art, collections in illustration of the progress of the arts, works in bronze, etc., and other objects of art, it is the reasonable deduction that the Congress intended by the word "artistic" to include only antiquities which were the production of artists and which had an æsthetic appeal. In the congressional hearings on H. R. 7456, which afterwards became the Tariff Act of 1922, such showing as was made before the Senate Committee on Finance seemed to be upon the theory that the articles named in said paragraph 1708 were assumed to be the work of artists, as contradistinguished from that of artisans. (Senate Hearings, Part VI, pp. 5011–5028.)

Webster's New International Dictionary, 1925, thus defines the adjective "artistic":

artistic. a. Of or pertaining to art or artists; made in the manner of an artist; conforming to, or characterized by, art; showing taste or skill.

One of the meanings attached to the word "artist" by the same lexicographer is:

artist. 3. One who professes and practices an art in which imagination and taste preside over the execution, esp. a fine art.

It is true that the same author also defines the word "artist" as having a meaning including one who practices some mechanical art or craft. It is equally true that in the ordinary use of the term in the language of the people, singers, actors, and others are alluded to as artists. We are convinced, however, that it was in the sense given by the above-quoted definitions that the Congress intended to use the word "artistic." This being true, something more is required to make an antiquity artistic, under this paragraph, than mere mechanical skill.

While, in a general sense, the diamond here in question may be said to be artistic, it is our duty to determine the meaning of the words "artistic antiquities" as used by Congress in said paragraph 1708.

For that purpose, we may consider other words in the paragraph as an aid to construction.

The paragraph begins with the words "Works of art." These words are followed by such words as "works in bronze, marble, terra cotta," etc. Obviously, Congress did not intend to permit all works in bronze, utilitarian and otherwise, more than 100 years old, to be admitted free of duty. We must read into those words something more, and we think "works in bronze," etc., must have at least some of the essentials of works of art or objects of art in order to fall within the paragraph. So, in construing the words "artistic antiquities," we should not overlook their association with the words "works of art," and, considering them together, we arrive at the conclusion that "artistic antiquities" under the paragraph must be productions embodying in their creation æsthetic expression.

It does not necessarily follow that the inclusion of this element must make them works of the fine arts, but in order to be "artistic," as that word is used in paragraph 1708, there must be in the production of the article a mental concept resulting in an æsthetic expression of the producer, or, applied to this case, the cutter of the diamond. If his work was merely that of a cutter following well-established rules, and involving no æsthetic expression originating in his own mind and thought, it is not artistic, however beautiful it may be.

Several cases are cited by the importer which, it is contended, indicate that the product of a mechanical art may be artistic, and from which the deduction is drawn by appellees that this diamond, although the product of a mechanic, may, nevertheless, be deemed artistic.

The leading cases cited in this connection are *United States* v. *Perry*, 146 U. S. 71; *United States* v. *Olivotti & Co.*, 7 Ct. Cust. Appls. 46, T. D. 36309; *Petry* v. *United States*, 11 Ct. Cust. Appls. 525, T. D. 39666; and *Frei Art Glass Co.* v. *United States*, 15 Ct. Cust. Appls. 132, T. D. 42214.

In the *Perry* case, the court had before it certain stained-glass windows containing effigies of saints and representations of other Biblical subjects, executed by artists, and embodying original and æsthetic conception. In the *Olivotti* case a marble font and two marble seats were involved. The font was executed by an artist, was an original conception, and had a distinct æsthetic appeal. In the *Petry* case a marble mosaic picture was involved, which, as the court said in the opinion filed therein, depicted an elderly man at work, and "the execution is artistic in a marked degree." In the *Frei* case mosaic pictures and panels were involved. Some of these were original works, some were copies, but all embodied "the artistic conception and artistic execution as well." In each of the cases cited, the

issue was whether the articles in question were "works of art," within the particular paragraph of the statute in each case. That the articles involved were not held to be such was due to the fact that the court, in each case, came to the conclusion that the statutory words "works of art" were intended to extend only to works of the fine arts.

While these authorities announce the rule that there may be articles which can not be classified as belonging to the fine arts, and which yet are artistic, they also indicate, in a marked degree, the elements which are usually taken in account in concluding that an object is or is not artistic. In every instance there was the work of the artist, the artistic concept, which added originality to the work and gave it a distinctive appeal to the artistic sensibilities. The skilled craftsman, the lapidary, the stone cutter, the cabinetmaker, each can produce objects of beauty by the practice of his craft. It is only, however, when he leaves the beaten paths of his trade, and, as a result of a mental concept, constructs something original with him, which appeals to the artistic eye and mind, that his work ceases to be that of an artisan and becomes that of an artist.

What is or is not artistic depends largely upon the degree of mental perception of the individual. To the Alaskan Indian a totem pole is artistic and also a work of art. As our mental and æsthetic comprehension increases, our ideas of what constitutes an artistic creation develop and change. But one thing we do know, that a thing, to be artistic, must be something more than the common product of a utilitarian art or trade. Divesting our minds of the glamour and romance of the history of this diamond, we have nothing left but a large diamond, cut in an ordinary way.

Counsel for appellant devote a considerable portion of their brief in this court to two propositions, namely: First, that there has been a legislative ratification of a long-established administrative practice of classifying goods such as that imported here as cut and unset precious stones; and, second, that the designation of the imported goods as "diamonds, * * * cut but not set," under said paragraph 1429 is more specific than the designation "artistic antiquities." In view of the conclusion we have reached in what we have heretofore said, it will not be necessary to express an opinion on either of these contentions.

The judgment of the Customs Court is *reversed* and the cause *remanded* for further proceedings in conformity herewith.